**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEVIN SCHEURING,
        *Plaintiff-Appellant,*

v.

TRAYLOR BROTHERS, INC.,
        *Defendant-Appellee.*

No. 04-56844

D.C. No.
CV-03-06613-RZ

OPINION

Appeal from the United States District Court
for the Central District of California
Ralph Zarefsky, Magistrate Judge, Presiding

Argued and Submitted
November 16, 2006—Pasadena, California

Filed February 14, 2007

Before: Richard D. Cudahy,* Betty B. Fletcher, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Cudahy

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

## COUNSEL

John R. Hillsman, McGuinn, Hillsman & Palefsky, San Francisco, California, and David W. Robertson, Austin, Texas, for the plaintiff-appellant.

Mitchell S. Griffin and Richard C. Wootton, Cox, Wootton, Griffin, Hansen & Poulos, LLP, San Francisco, California, for the defendant-appellee.

**OPINION**

CUDAHY, Circuit Judge:

Plaintiff Kevin Scheuring appeals an adverse grant of summary judgment. Scheuring claims that he is a "seaman" entitled to consideration under the Jones Act, 46 U.S.C. app. § 688(a). In the alternative, he argues that he is entitled to sue the vessel owner in tort under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901 *et seq.* The district court determined that he was not a "seaman" because the nature of his employment was not substantially connected to a vessel, the *William F*, and therefore, he could not sue under the Jones Act. Moreover, the court determined that the alleged negligence in the positioning of a ramp did not implicate the duty owed by Traylor Brothers as vessel owner, and therefore, Scheuring could not sue under 33 U.S.C. § 905(b). We reverse and remand as to both claims.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2002, Kevin Scheuring was hired by the defendant Traylor Brothers, Inc. as a crane operator on the *William F*. The *William F* is a 130-foot long, 798-ton, steel-hulled derrick barge used in construction projects. For the relevant period, the *William F* was owned and operated by Traylor Brothers. A 130-ton crane, which the plaintiff operated, was affixed to the barge.

At the time of the plaintiff's injury, the *William F* was being used in the Long Branch Cruise Terminal (LBCT) construction project within the Long Beach Harbor. The LBCT project involved building a T-shaped docking facility for Carnival Cruise Lines. Traylor Brothers was a subcontractor on the project in charge of building a passenger wharf, two flanking mooring dolphins[1] and a trestle running back to the shore.

---

[1]Mooring dolphins are timber piles driven to the bottom of the harbor for cushioning seacraft during landing.

The *William F* was dispatched to the LBCT project from June 2002 through November 2002.

Scheuring was hired as a crane operator in August 2002 to work for the duration of the LBCT project. He was a member of the Operating Engineers Union. His work background primarily consisted of operating and maintaining heavy equipment. He was trained as a crane operator, received wages as a crane operator and did not consider himself a specialist in marine work. His primary job while employed with Traylor Brothers on the *William F* was to operate the crane to loft pile, hold the leads that captured the pile and start the hammer that drives the pile. At times, Scheuring helped to move the *William F* by fleeting, or heaving back and forth on her anchor lines, for purposes of repositioning the barge for the next set of piles to be driven. Scheuring occasionally handled lines, weighed and dropped anchors, stood lookout, monitored the marine band radio and spliced wire and rope.

The plaintiff alleges that the barge was subject to the tides and tossed by sea swells, wind waves, vessel wakes and tidal currents. The barge did not operate on its own power, but rather by means of winches,[2] which slackened or tightened anchor lines, thereby allowing minor maneuvering and repositioning. The *William F* fleeted, or heaved back and forth on her anchor lines, on a daily basis. The barge was secured to the shore by multiple permanent lines. On occasion, these cables would break. The barge was also unmoored and towed by a tugboat to a new anchorage on at least three occasions while the plaintiff was aboard.

To board the barge, the crew had to walk down a 20-foot ramp leading from the water's edge to an offshore float. Once on the float, the crew would take a skiff to the barge. The

[2]A winch is a stationary motor-driven or hand-powered machine used for hoisting or hauling, where a rope or chain is wrapped around a drum and is attached to the load being moved.

ramp could not be affixed to the float, and, on average, a few times a week it would fall into the water. On the morning of September 11, 2002, the plaintiff arrived at work and found the end of the ramp in the water. While attempting to lift the 180-pound ramp out of the water with the help of others, he slipped and injured his back. Scheuring alleges that Traylor Brothers had known for at least two months about this problem with the ramp.

Scheuring filed this lawsuit against Traylor Brothers claiming that he is entitled to recover for his personal injuries as a seaman under the Jones Act, 476 U.S.C. § 688. In the alternative, Scheuring sues for negligence under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b).[3] The defendant filed a motion for summary judgment. The district court granted that motion on August 24, 2004. The plaintiff moved for reconsideration on September 16, 2004, which the district court denied on October 6, 2004. Scheuring appealed.

## STANDARD OF REVIEW

We review de novo the order granting summary judgment. *Martinez v. Signature Seafoods Inc.*, 303 F.3d 1132, 1134 (9th Cir. 2002). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether summary judgment is appropriate, we view the facts in the light most favor-

---

[3]Scheuring also sues for negligence based on unseaworthiness and for maintenance, cure and related payments. Both parties agree that these two additional claims depend on Scheuring's qualifying as a "seaman" under the Jones Act. In other words, if the Jones Act claim fails, so too do the unseaworthiness and maintenance, cure and related payments claims.

able to the non-moving party and draw reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

The present case involves alternative maritime tort claims. First, the plaintiff is suing the defendant, as his employer, as a seaman under the Jones Act, 46 U.S.C. app. § 688(a). In the alternative, he is suing the defendant, as the vessel owner, as a harbor worker under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b). We will examine each claim in turn.

A.   *The Jones Act Claim*

**[1]** The Jones Act provides in pertinent part:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply . . . .

46 U.S.C. app. § 688(a). The defendant contends that the plaintiff is not a "seaman" and therefore is not entitled to recovery under the Jones Act. The determination of who is a seaman is a mixed question of fact and law. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995). The interpretation of statutory terms is within the purview of the court, but " '[i]f reasonable persons, applying the proper legal standard, could differ as to whether the employee was a "member of a crew," it is a question for the jury.' " *Id.* (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

**[2]** Although the Jones Act was originally enacted in 1920, the question of who is a "seaman" continues to perplex the

courts. In the 1990s, the Supreme Court considered this question in a number of cases. In *Chandris*, the Court articulated a two-part test which drew on its holdings in earlier cases:

> [T]he essential requirements for seaman status are twofold. First, as we emphasized in *Wilander*, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.' " . . .
>
> Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and its nature.

*Chandris*, 515 U.S. at 368 (citations omitted). The defendant does not dispute that Scheuring's employment contributed to the function of the *William F*, thus meeting the first requirement of the test. Nor does the defendant question the "substantial duration" component of the second requirement. The key issue in this branch of the case is whether the nature of Scheuring's duties involved a substantial connection to the *William F*.

**[3]** As the Supreme Court explained in *Chandris*, the first part of the requirement is very broad, covering " '[a]ll who work at sea in the service of a ship.' " *Id.* (quoting *Wilander*, 498 U.S. at 354). The second requirement, on the other hand, narrows the pool of potential seaman in order

> to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

*Id.* The Court explained that this test is "fundamentally status based." *Id.* at 361. "Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* The Court also equated the question of who is a "seaman" to the determination of who is a "member of a crew." *Id.* at 356. Decided two years later, *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548 (1997) provides additional guidance on the substantial connection prong of the test articulated in *Chandris*.

> For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees.

*Papai*, 520 U.S. at 555. The crux of the second prong of the "seaman" test involves distinguishing land-based from sea-based employees by examining the employee's activities and duties.

We have previously grappled with the "nature" component of the second prong of the *Chandris* test. Two cases, one which affirmed a grant of summary judgment, *Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289 (9th Cir. 1997), and one which reversed, *Delange v. Dutra Constr. Co.*, 183 F.3d 916 (9th Cir. 1999) (per curiam), are of particular relevance to the present case, although neither is entirely on point.

In *Cabral*, we affirmed the district court's grant of summary judgment for the defendant, holding that the plaintiff, a crane operator aboard a construction barge, was a land-based worker with only a transitory or sporadic connection with the

barge. We determined that *Papai* and *Chandris* stand for the notion that the court should focus on whether the employee's duties are "primarily sea-based activities" in determining whether the nature of the connection to the vessel is substantial. *Cabral*, 128 F.3d at 1293. The court concluded that the plaintiff was a land-based worker because

> Cabral was hired to work on Barge 538 as a crane operator and not as a crew member. Cabral presents no evidence showing that he was ever aboard Barge 538 when it was anywhere but the Ford Island Ferry project. . . . Furthermore, Cabral presents no evidence showing that he would continue to work aboard Barge 538 after the Ford Island Ferry project was completed.

*Id.* Importantly, there is no mention of *Barge 538*'s moving during Cabral's time aboard it.

The plaintiff urges this court to follow *Delange*, 183 F.3d 916. In a per curiam opinion, the court there held that the plaintiff raised a triable issue of fact as to his status as a seaman and remanded the case for further proceedings. *Id.* at 919. The plaintiff was hired as a carpenter on a piledriving crew engaged in the construction of a navigation aid. *Id.* at 918. The plaintiff rode to the construction site on a barge that was used as a work platform. *Id.* at 918. While attempting to anchor the barge to the construction site, the plaintiff severely injured his hand. *Id.* at 918-19. In reversing the district court's grant of summary judgment, we distinguished the plaintiff in that case from the plaintiff in *Cabral* by examining the specific activities or duties of the two plaintiffs. Unlike the crane operator in *Cabral*, the plaintiff in *Delange* claimed that

> "a big part" of his job was to serve as a lookout, cargo stower, line handler, and occasional pilot when the barge was being moved—all of which are clearly seaman's duties—and only devoted 10% of his time

to carpentry. He also stated that more than 80% of his time was spent onboard the barge where "most" of the work involved crewman and deckhand duties.

*Id.* at 920. Although Delange was hired as a carpenter, his duties were more appropriately characterized as sea-based duties.

**[4]** As the district court noted here, Scheuring's employment as a crane operator is in many ways similar to the plaintiff's employment in *Cabral. Scheuring v. Traylor Bros.*, No. CV 03-06613-RZ, slip op. at 6 (C.D. Cal. Aug. 25, 2004). However, there are important distinctions between the two cases, which warrant reversal of the district court's grant of summary judgment. The condition of the *William F* was sufficiently different from that of the *Barge 538* (in *Cabral*) to distinguish the plaintiff's status in *Cabral* from the present case. The plaintiff in *Cabral* did not make any showing of exposure to vessel-movement or other characteristic seamen's risks. Here, Scheuring alleges that the boat was subject to sea swells, wind waves, vessel wakes and tidal currents. He further alleges that the barge fleeted on her anchor lines on a daily basis. And, most importantly, on at least three occasions, the plaintiff was aboard the barge as it was unmoored and moved by a tugboat. The plaintiff contends that during those movements, he performed duties that could be characterized as "sea-based" duties, such as handling lines, weighing and dropping anchors, standing lookout, monitoring the marine band radio and splicing wire and rope. These claims show the existence of a factual dispute whether the plaintiff's employment was land-based or sea-based. *See Sw. Marine, Inc. v. Gizoni*, 502 U.S. 81, 84, 92 (1991) (holding that genuine issues of material fact existed as to the plaintiff's seaman status where the plaintiff rode on floating platforms as they were towed into place, occasionally served as a lookout and gave maneuvering signals to the tugboat operator and received lines passed to the platforms by the ships' crews to secure the platforms). The district court incorrectly described

the *William F* as stationary. But its movements, although perhaps relatively minor and infrequent, are sufficient to distinguish the present case from *Cabral* and warrant reversal. *See also Delange*, 183 F.3d at 920 (noting that the barge moved only four times during the relevant period of time).

**[5]** The plaintiff urges this court to rely solely on the plaintiff's account of surges, tides and swells to classify him as a seaman. We reject this approach as it would render the second requirement — that the employee have a substantial connection to the vessel both in terms of duration and nature — meaningless. By analyzing only the vessel's movements, the activities and duties of the employee would become inconsequential — a result which conflicts with Supreme Court and Ninth Circuit precedent. *See Papai*, 520 U.S. at 555; *Chandris*, 515 U.S. at 368; *Cabral*, 128 F.3d at 1293. Therefore, we examine the vessel's movements in light of the plaintiff's duties in order to assess whether the plaintiff has presented evidence that would allow a jury to find a substantial connection to the vessel both in terms of duration and nature. *See Papai*, 520 U.S. at 555 (stating that courts should "concentrate on whether the employee's duties take him to sea").

**[6]** The evidence supporting the plaintiff's Jones Act claim may be somewhat limited. Nonetheless, the movements of the vessel, albeit relatively minor, and the sea-based duties of the plaintiff, although ancillary to his core responsibility as a crane operator, raise genuine issues of material fact which warrant jury consideration. Accordingly, we reverse the district court's grant of summary judgment for the defendant.

B.  *Longshore and Harbor Workers' Compensation Act Claim*

**[7]** The plaintiff alleges an alternative claim for relief. If he fails to establish that he is a seaman under the Jones Act, then, he argues, he is a harbor worker entitled to relief under the Longshore and Harbor Workers' Compensation Act

(LHWCA), 33 U.S.C. §§ 901 *et seq*. Pursuant to § 905(a), an employee may not recover in tort for the negligence of his *employer*; rather, he is entitled to statutory payments. However, § 905(b) allows an employee to recover for the negligence of a *vessel owner*: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel . . . ." 33 U.S.C. § 905(b).

[8] Here, the defendant is both the employer and the vessel owner, thus a case such as this is commonly referred to as a "dual-capacity" suit. When the vessel owner and the employer are the same entity, an employee may recover for negligence if the negligence was that of the employer acting in its capacity as a vessel owner, not as an employer. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 531 n.6, 532 (1983).[4] The question here is whether Traylor Brothers' alleged negligence with respect to the ramp-float-skiff system of entry was as vessel owner or as employer. We conclude that there is a genuine issue of material facts as to whether the duty owed to Scheuring belonged to Traylor Brothers as the vessel owner.

---

[4]In 1984, Congress amended § 905(b) to bar negligence actions where the "person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel." 33 U.S.C. § 905(b). In *Bush v. Eagle-Picher Indus., Inc.*, 927 F.2d 445, 449 (9th Cir. 1991), we incorrectly stated in dicta that the amendment barred *all* dual-capacity suits. We have already acknowledged this error. *See Heise v. Fishing Co. of Alaska, Inc.*, 79 F.3d 903, 907 n.2 (9th Cir. 1996) (noting that the statement in *Eagle-Picher* that the 1984 amendment barred dual-capacity suits was incorrect dicta). To the extent any confusion remains, the 1984 change bars only shipbuilders, ship repairers and ship breakers from bringing a claim where the employer and the vessel owner are the same entity. *See also Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 608 (1st Cir. 1996) (en banc); *Guilles v. Sea-Land Serv., Inc.*, 12 F.3d 381, 386 (2d Cir. 1993); *Gay v. Barge 266,* 915 F.2d 1007, 1010 (5th Cir. 1990). The plaintiff was not hired to provide shipbuilding, repairing or breaking services, and therefore his claim under the LHWCA is not barred by the 1984 amendment.

**[9]** The Supreme Court has indicated that Congress left to the courts the task of defining the vessel owner's duty of care. *See Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 97-98 (1994); *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165-66 (1981). In *Scindia*, the Court first considered the duties a vessel owner owed to an injured longshore worker, which in a subsequent case were divided into three categories:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett*, 512 U.S. at 98 (quoting *Scindia*, 451 U.S. at 167-68) (citations omitted).[5] The present case concerns the turnover

---

[5] In *Scindia* and *Howlett*, the vessel owner and the employer were separate entities. The Supreme Court has not yet considered the vessel owner's duties in a dual-capacity case. Our sister circuits have grappled with the question whether the duties outlined in *Scindia* and *Howlett* should also apply to dual-capacity cases. The First and Fifth Circuits have allocated the same vessel duties of care to dual and single capacity defendants. *See Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 612 (1st Cir. 1996) (en banc) (holding that "the duties of care described in *Scindia* should be applied in dual capacity cases"); *Castorina v. Lykes Bros. S.S. Co.*, 758 F.2d 1025, 1033 (5th Cir. 1985) (holding that "the duty owed by a shipowner to a longshoreman under section 905(b) is that established by *Scindia* and its progeny; this duty is neither heightened nor diminished when the longshoreman is employed directly by the vessel"). The Second Circuit, in a case preceding *Jones & Laughlin Steel Corp. v. Pfeifer*, held that a vessel owner assumes a greater duty of care when there is no independent employer. *Fanetti v. Hellenic Lines Ltd.*, 678 F.2d 424, 428 (2d Cir. 1982). Since we believe the duty of care defined by the Supreme Court in *Scindia* covers the alleged breach by Traylor Brothers as vessel owner, we do not need to reach this issue.

duty, of which there are two discrete duties — the duty of safe condition and the duty to warn. *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1268 (9th Cir. 1994); *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207 (9th Cir. 1989). For our purposes, we are most concerned with the duty of the owner to turn over the vessel in safe condition.

**[10]** In order to fulfill this duty:

> A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

*Howlett*, 512 U.S. at 98 (quoting *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 n.18 (1969)).[6] In light of this duty to turn over the vessel in safe condition, the present case poses two issues. The first issue is whether the ramp is part of the *William F*'s "equipment and appliances." *Howlett*, 512 U.S. at 98. The second issue is whether there is a genuine issue of material fact whether Traylor Brothers acted reasonably in fulfilling its turnover duty.

---

[6]The Supreme Court has not considered a case involving a non-longshoring harbor worker, like the plaintiff in the present case. Although there may be important differences between the two types of workers (*see Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 610 (1st Cir. 1996)), the basic holding of the Supreme Court and the Ninth Circuit with respect to the vessel owner's duties as to longshore workers pursuant to the LHWCA applies with equal force to that owed to harbor workers. In other words, the vessel owner owes a standard of care to a harbor worker, "mindful of the dangers he should reasonably expect to encounter," as opposed to a standard of care that might be owed to someone unfamiliar with the dangers of a ship, i.e., a guest of the boat.

**[11]** In rejecting Scheuring's LHWCA claim, the district court analogized the ramp to a dock or pier. *Scheuring v. Traylor Bros.*, No. CV 03-06613-RZ, slip op. at 9 (C.D. Cal. Aug. 25, 2004). In opposition, the plaintiff asks us to view the ramp as a gangway. This distinction is critical since a gangway constitutes an appliance of a vessel but a dock or pier does not. *See Victory Carriers, Inc. v. Law*, 404 U.S. 202, 207 (1971) (holding that a gangway is the dividing line between admiralty and state jurisdiction); *see also Romero Reyes v. Marine Enterprises, Inc.* 494 F.2d 866, 870 (1st Cir. 1974) (noting that "the authorities are virtually unanimous that maritime liability encompasses the gangway"). There is a genuine issue of material fact whether the ramp at issue in the present case is more like a gangway than a dock or pier.

**[12]** In order to board the barge, the plaintiff and the other individuals working aboard the *William F* had to use the ramp. There were no other means of embarking. Some of our sister circuits have held that a gangway or ramp which is "necessarily used for embarking and disembarking" becomes a "basic appurtenance of the vessel." *Sarauw v. Oceanic Navigation Corp.*, 655 F.2d 526, 528 (3d Cir. 1981); *see also Romero Reyes*, 494 F.2d at 869 (holding that the apparatus which was the "regular means of boarding and leaving the vessel" was included in the seaworthiness warranty). Even if the ramp could not be fairly characterized as a gangway, the turnover duty, at a minimum, requires a vessel to provide a safe means of access. *See Gay v. Barge 266*, 915 F.2d 1007, 1012 (5th Cir. 1990); *Romero Reyes*, 494 F.2d at 869; *cf. Davis v. Partenreederi M.S. Normannia*, 657 F.2d 1048, 1053 (9th Cir. 1981) (holding that the vessel owner had a responsibility to correct the positioning of the gangway).**[7]** The only

---

**[7]**Although not argued by the plaintiff, Traylor Brothers as vessel owner might have also breached its duty to intervene by failing to correct the unsafe condition of the ramp. *Sarauw*, 655 F.2d at 529 (determining that a jury could find that the vessel owner "failed in its duty of exercising due care to discover and correct the unsafe condition of the gangway"); *Gay*,

difference between the ramp used by the plaintiff here and a gangway is that the ramp was not attached to the barge. The fact that the ramp did not extend to the barge, which presumably would have made it safer, should not preclude Scheuring's lawsuit. Such logic would allow a barge owner to avoid liability by providing no means of access and effectively requiring harbor workers to swim to the barge. Accordingly, we conclude that there is a genuine issue of material fact involving the characterization of the ramp at issue here.

**[13]** The second issue before us concerns whether Traylor Brothers discharged its turnover duty by providing the ramp-float-skiff means of access. The vessel owner has only to exercise ordinary care in light of the fact that the operation will be conducted by "an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter." *Howlett*, 512 U.S. at 98. "This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them." *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1208 (9th Cir. 1989). But, any hazardous condition must not constitute "an unreasonably dangerous work environment to experienced longshoremen exercising reasonable care." *Martinez v. Korea Shipping Corp.*, 903 F.2d 606, 610 (9th Cir. 1990).

We have previously affirmed grants of summary judgment where the plaintiff failed to act as an "expert and experienced stevedore." In *Bjaranson*, we held that a bare boat charterer did not breach the duty of safe condition where "an expert and experienced stevedore could have safely conducted the cargo

---

915 F.2d at 1012 ("The vessel owner has a duty to intervene in the stevedore's operations when he has actual knowledge both of a hazardous condition *and* that the stevedore, in the exercise of 'obviously improvident' judgment, intends to continue work in spite of that condition. This court has previously held this duty applicable even when the vessel owner conducts its own stevedoring operations.") (footnote omitted).

operation." 873 F.2d at 1208. Similarly, in *Ludwig v. Pan Ocean Shipping Co.*, 941 F.2d 849, 852 (9th Cir. 1991) (per curiam), we held that the plaintiff could have avoided the hazardous situation, and therefore, the plaintiff failed to show that he acted as an expert and experienced stevedore.

**[14]** But, the question whether a defendant acted reasonably is ordinarily a question for the trier of fact. *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994); *Martinez*, 903 F.2d at 609. In *Thomas*, we reversed the district court's grant of summary judgment for the defendant vessel owner, finding a material issue of fact as to the ultimate issue of "unreasonable dangerousness." In that case, the plaintiff fell through a hatch opening which was completely uncovered and unguarded. 42 F.3d at 1268. Similarly, in *Martinez*, we reversed a summary judgment order in favor of the vessel owner reasoning that whether an unguarded ladder opening on a lashing platform was unreasonably dangerous to longshore workers was a question of fact for the jury. 903 F.2d at 609.

**[15]** Here, Scheuring has established that there are genuine issues of material fact with respect to the ramp's status and Traylor Brothers' exercise of its turnover duty. Since these issues should have gone to a jury, we reverse the district court's grant of summary judgment as to the LHWCA claim.

REVERSED AND REMANDED.